## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **CEVA ANIMAL HEALTH, LLC**, a Kansas limited liability company, | ) ) | |
| | ) | Case No: _____ |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| **PREMIUM SELLERS LLC**, a Florida limited liability company, and **JOHN DOES 1-10**, individually or as corporations/business entities, | ) ) ) ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. §§ 1114, 1125(A), AND RELATED STATE CLAIMS

Plaintiff Ceva Animal Health, LLC ("Ceva" or "Plaintiff"), brings this action against Defendants Premium Sellers LLC and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) common law trademark infringement; (4) common law unfair competition; and (5) tortious interference with existing contracts and business relationships. These claims arise from Defendants' misappropriation of Ceva's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Ceva's trademarks. In support of its Complaint, Ceva alleges as follows:

## PARTIES

1.      Ceva is a limited liability company, organized under the laws of Kansas, with its principal place of business located in Lenexa, Kansas.

2.      Premium Sellers LLC ("Premium") is a limited liability company organized under the laws of Florida.  According to corporate documents filed with the Florida Department of State, the principal place of business of Premium is located in Orlando, Florida.  According to those filings, Premium's principal, mailing, and agent address is 1317 Edgewater Drive #6045 Orlando, FL 32804.  This is the address for a business called "PhysicalAddress.com," a company that provides virtual addresses in Orlando Florida for individuals and entities who either are not located in Florida or want to hide their true location.  Premium is in the business of buying and selling online storefronts on various third-party seller platforms.  Premium operates or assists in the operation of online storefronts on www.amazon.com ("Amazon") currently called "Shop With Saving"      (merchant      ID      A1FCNWLH3INPJ7      which      can      be      accessed      at https://www.amazon.com/sp?seller=A1FCNWLH3INPJ7),      "J3-Deals"      (merchant      ID A3Q37QN05NSF47      which      can      be      accessed      at https://www.amazon.com/sp?ie=UTF8&seller=A3Q37QN05NSF47), as well as other currently unidentified storefronts (the "Amazon Storefronts").[1]  Premium does business throughout the United States through the Amazon Storefronts, including in Kansas.

3.      John Doe 1 is a natural person who owns and operates Premium and the Amazon Storefronts.  John Doe 1 has identified himself as "Serge Lynn" ("Lynn") to other individuals involved in the investigation leading to this filing.  Lynn does business throughout the United States through the Amazon Storefronts, including in Kansas.  Upon information and belief, Ceva asserts that the name, Serge Lynn, is an alias.

---

[1] Counsel for Ceva has also identified another storefront on Amazon called "Green Goods Enterprises LLC" (merchant ID A2U9A2WG2UXCGE which can be accessed at https://www.amazon.com/sp?ie=UTF8&seller=A2U9A2WG2UXCGE).  This storefront has not sold products infringing on Ceva's trademarks.  It is included in this complaint to further show the extent and complexity of Premium's network and how, short of this lawsuit and subsequent discovery, Ceva will not be able to identify all the storefronts affiliated with Premium.

4.      Ceva believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Ceva.  Therefore, Ceva sues these Defendants by the fictitious names John Does 2 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Ceva will seek leave to amend this Complaint accordingly.  If Ceva does not identify any such parties, it will dismiss these Defendants from this action.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  Ceva's federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a), and its claims arising under the laws of the State of Kansas are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

6.      This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Kansas and established sufficient minimum contacts with Kansas by, among other things, advertising and selling substantial quantities of infringing products bearing Ceva's trademarks to consumers within Kansas through a highly interactive commercial website, with knowledge that Ceva is located in Kansas and is harmed in Kansas as a result of Defendants' sales of infringing products to Kansas residents.  Defendants know that Ceva is located in Kansas, among other reasons, because they received a cease-and-desist letter informing them that Ceva is located in Kansas and is harmed in Kansas by their unlawful actions.  Ceva's claims arise out of Defendants' substantial and regular sales of infringing products bearing Ceva's trademarks to Kansas residents.

7.      Venue is properly found in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Ceva and Its Trademarks

8.      Ceva researches, develops, and markets high-quality veterinary, vaccine, and health products for pets ("Ceva products").  Ceva allows its products to be sold to end-user consumers in the United States only by Ceva itself and by sellers who Ceva has expressly authorized to sell Ceva products ("Authorized Sellers").  These sellers include retailers and authorized veterinarian clinics.

9.      Ceva allows Authorized Sellers to sell Ceva products only in approved channels and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Ceva Rules").

10.     Ceva devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By distributing Ceva products to end-user consumers exclusively through itself and its Authorized Sellers that are required to follow the quality controls and other requirements in the Ceva Rules, Ceva ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of its brands.  In the highly competitive markets for veterinary, vaccine, and health products for pets, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

11.     To promote and protect its brands, Ceva has secured the rights to numerous trademarks relating to its business that are registered with the United States Patent and Trademark

Office.   These trademarks include, but are not limited to: FELIWAY® (U.S. Trademark Registration Nos. 5,314,421; 2,189,709),  ADAPTIL® (U.S. Trademark Registration Nos. 5,319,655; 4,004,586), VECTRA 3D® (U.S. Trademark Registration No. 3,571,569), CATEGO® (U.S. Trademark Registration No. 5,157,641),  DOUXO® (U.S. Trademark Registration No. 3,297,625),    THUNDERWORKS®    (U.S.    Trademark    Registration    No.    4,704,258), THUNDERSHIRT® (U.S. Trademark Registration No. 4,277,385), THUNDEREASE® (U.S. Trademark Registration No. 5,346,433), THUNDERWUNDERS ((U.S. Trademark Registration No. 5,712,741) and THUNDERLEASH® (U.S. Trademark Registration No. 4,456,484) (collectively, the "Ceva Trademarks").

12.    The registration for each of the Ceva Trademarks is valid, subsisting, and in full force and effect.

13.    Ceva actively uses, advertises, and markets all of the Ceva Trademarks in commerce throughout the United States.

14.    Consumers recognize the Ceva Trademarks as being associated with high-quality veterinary, vaccine, and health products for pets.

15.    The Ceva Trademarks are widely recognized by the general consuming public of the United States and Ceva is recognized as the source of products bearing the Ceva Trademarks.

16.    Due to the superior quality and exclusive distribution of Ceva's products, and because Ceva is recognized as the source of high-quality products, the Ceva Trademarks have substantial value.

**Online Marketplaces and the Challenge They Present to Ceva's Product Quality Controls**

17.    E-commerce retail sales have exploded over the past decade.  From 2013 to the end of 2023, the percentage of total retail sales in the United States that were completed through e-

commerce channels rose from 5.6% to 15.6%.  E-Commerce Retail Sales as a Percent of Total Sales, FEDERAL RESERVE BANK OF ST. LOUIS (March 1, 2024), https://fred.stlouisfed.org/series/ECOMPCTSA.

18.    In 2023, consumers spent approximately $1.12 trillion on ecommerce sales, a 7.6% increase from 2022.  *See* Abbas Haleem, US ecommerce sales penetration hits new high, DIGITAL COMMERCE 360 (February 26, 2024), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

19.    While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

20.    Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

21.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who can obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

22.    It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray*

*market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.    It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.    *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

23.    Third-party sellers on Amazon may also sell counterfeit items or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

24.    For example, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."    Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.    The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."    *Id*. at 14-15, 38.    *See also* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019,

https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(20 19-11-07).pdf.

25.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019,

26.     In its 2022 annual report to its shareholders, Amazon also admitted that third-party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  *See* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), available at https://ir.aboutamazon.com/annual-reports-proxies-and-shareholder-letters/default.aspx.  Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.  *Id.*

27.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the safety of consumers.

28.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

29.     When purchasing products on an online marketplace, customers do not know if a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.

30.     For all these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

31.     When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor-quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

32.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

33.     Online product reviews significantly impact a brand's reputation.  Survey results show that 99.75% of United States consumers read reviews "at least sometimes" when they consider buying a new product online, and 45% will not purchase a product if there are no reviews available for it.  *Survey: The Ever-Growing Power of Reviews (2023 Edition)*, Power Reviews, https://www.powerreviews.com/research/power-of-reviews-2023/ (last visited Mar. 1, 2024).

34.     Reviews are especially impactful on online consumers.  In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears

to be compromised.  However, online consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality.  Therefore, online consumers rely more on brand reputation and reviews.

35.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  Not only are consumers less likely to buy a product with negative reviews, websites like Amazon use algorithms to downgrade products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to further downgraded product placement.

### Ceva's Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written by Consumers Who Purchased Poor-Quality Products From Unauthorized Sellers on Online Marketplaces

36.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

37.     Numerous consumers have written negative reviews of Ceva products being offered for sale by unauthorized sellers on online marketplaces.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Ceva products low "ratings" and complained of receiving products that were damaged, defective, previously used, not sealed, or tampered with.

38.     For example, Defendants have sold on Amazon the Ceva product seen in the screenshot below:




39.    Consumers have left negative reviews of this product complaining that they received products that were tampered with, sent in open packaging, or suspected counterfeits:



Jackie H.

⭐☆☆☆☆ **Defective refills**

Reviewed in the United States on December 8, 2023

Size: 3 pack | Verified Purchase

I was sold a 3 pack of defective refills. The lids on all 3 did not fit properly and the labels were coming off on all 3. I should have known something was wrong then. Each refill from the 3 pack lasted less than a week in the diffusers. I buy these all the time and have never had this happen until now. Although I think Feliway is a good product, I will probably not buy them thru Amazon again.



Cat adopter

⭐☆☆☆☆ **Do not recommend**

Reviewed in the United States on September 5, 2023

Size: 3 pack | Verified Purchase

I'm pretty sure it was filled with water. I compared to another one and it is not the same. Also I ordered 3 and received 1. Also the label wasn't completely on the bottle. Very suspicious.



Aaron

⭐☆☆☆☆ **Seems like water... definitely got ripped off**

Reviewed in the United States on August 14, 2023

Size: 6 pack | Verified Purchase

I've been buying this exact product locally for a long time with great success. But I decided to buy it in bulk here on Amazon to save some money. I'm on my second month and my cats nor I are seeing the same results as buying it at my local pet store. The ones I buy at the store come with a seal to ensure it's an unused product and they have a slight scent to them, these do not come with a seal at all and do not have a scent. And by scent, I do not mean they are scented. But if you put your nose up to the container it usually has a scent. Not sure what the scent is, but it's there with store bought products. My guess is this is just water. Sad that I lost all that money buying these. I do not recommend them.



Luna

⭐☆☆☆☆ **Product is good but don't order from Amazon**

Reviewed in the United States on August 12, 2023

Size: 6-Pack | Verified Purchase

I've been using these plug-ins for years now and they're great for our cats. I often order from other pet sites but sometimes I need them more quickly and turn to Amazon. Thought I was getting a great deal because you got 25% off the first subscribe and save but when I received the order, the box was entirely open - nothing at all was sealed. Amazon refused to replace the item or offer the original selling price if I repurchased. So now I have no item and have to reorder the same item that they failed to deliver correctly but now at a higher price than I originally paid.



nolan
⭐☆☆☆☆  **Item was opened prior to delivery**
Reviewed in the United States on June 26, 2023
Size: 48 mL   |   Verified Purchase

Item was already opened prior to delivery. There is no way I'm using it, who knows what was done to it.



40.     Other customers complained that they received orders that were incomplete, expired, or damaged.

J. C.
⭐☆☆☆☆  **Package crushed, oily on outside, awful smell**
Reviewed in the United States on September 24, 2023
Size: 48 mL   |   Verified Purchase

This time the packages were crushed, the bottles were oily on the outside and when plugged in they smelled awful. Had to unplug. Didn't happen before. I'm going to try the classic version

Samantha Hayward
⭐☆☆☆☆  **They sent one refill instead of the three I paid for**
Reviewed in the United States on September 11, 2023
Size: 3 pack   |   Verified Purchase

Only received one, paid for a set of three. No returns, refunds or exchanges. Very disappointing because this product really helps my cat.

Lori Moon
⭐☆☆☆☆  **Torn box**
Reviewed in the United States on January 13, 2023
Size: 1 Pack   |   Verified Purchase

This took 2 weeks to receive and when I opened the package, the box was completely falling apart! The product was fine but why the heck was the box so torn up??

Deb Hudson
⭐☆☆☆☆  **Out of date product.**
Reviewed in the United States on February 20, 2022
Size: 1 Pack   |   Verified Purchase

Started to use the diffusers I ordered January 25, 2022 today (2/20/2022) and one expired 4/1/2021! Now I have to figure out how to get one replaced. Frustrating.



41.     Below is a screenshot of another Ceva product that Defendants have sold on Amazon:



42.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews after they received orders that were suspected counterfeits, expired, or incomplete:



43.     The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Ceva products listed on Amazon that Defendants have sold through

their Amazon Storefronts.  These reviews harm the reputation and goodwill of Ceva and its brands because consumers around the world view and rely on these reviews, even when purchasing Ceva products offline.  Even when the text of a review makes clear that a problem was seller-caused, negative reviews still lower the average review score and search placement of Ceva products.

44.    Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold a high volume of products bearing the Ceva Trademarks on Amazon and are not subject to Ceva's quality controls, however, it is exceedingly likely that some of the foregoing negative reviews—and the other similar negative reviews of Ceva products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Ceva Trademarks from Defendants.

**Ceva Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Caused By Online Marketplaces and Ensure Customers Receive the Genuine, High-Quality Products They Expect From Ceva**

45.    The above reviews show how sales of poor-quality Ceva products disappoint Ceva's consumers and cause significant harm to the reputation and goodwill of Ceva and its brands.  To protect itself and consumers from these harms, Ceva implemented a quality control program that applies to all of its Authorized Sellers as well as to all products that Ceva itself sells to consumers.

46.    The goals of Ceva's quality control program are to minimize the likelihood that poor-quality products reach consumers and ensure that consumers who purchase Ceva products, including consumers who buy online and those that purchase in a brick-and-mortar setting, receive the high-quality products and services they expect from products sold under the Ceva name.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Ceva Trademarks.

47.     Ceva's ability to exercise quality controls is particularly important for the products it sells because some of Ceva's products are ingested or inhaled by animals and there may be health and safety risks associated with products that have not been properly inspected, stored, or handled.

48.     Ceva abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

49.     Ceva's ability to exercise its quality controls is essential to the integrity and quality of Ceva products, as well as the value of the Ceva Trademarks and other intellectual property.

**Authorized Sellers May Sell Ceva Products Only Through Specific Channels and Must Adhere to Ceva's Quality Control and Customer Service Requirements**

50.     Ceva maintains strict quality controls over Ceva products by allowing Ceva products to be purchased by end-user consumers only from Ceva itself or from Authorized Sellers. Ceva's Authorized Sellers include "Authorized Distributors" and "Authorized Resellers."

51.     All of Ceva's Authorized Sellers are permitted to sell Ceva products only in certain channels and are required to abide by the Ceva Rules.  Thus, every Authorized Seller that sells Ceva products is subject to Ceva's quality control requirements.

52.     The Ceva Rules require Authorized Sellers to purchase Ceva products only from Ceva directly or from other Authorized Sellers, per the applicable policy.  This restriction ensures that the chain of custody can be established for all Ceva products sold to consumers by Authorized Sellers, and thus prevents unsafe or unsanitary products, secondhand goods, or other low-quality products from entering into the distribution chain.

53.     The Ceva Rules also limit to whom and where Authorized Sellers may sell Ceva products.  To prevent persons outside of Ceva's quality controls from acquiring and reselling Ceva products, the Ceva Rules prohibit Authorized Sellers from selling Ceva products to any third party who is not an Authorized Seller and who intends to resell the products.  Authorized Sellers are

permitted to sell Ceva products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

54.     Given the many perils of unauthorized online sales as described above, Authorized Sellers are also permitted to sell Ceva products online only on websites that they themselves own and operate or, in certain circumstances, that are owned and operated by another Authorized Seller. Authorized Sellers are prohibited from selling Ceva products on any other website—including on any online marketplace website—unless they first apply for and receive written approval from Ceva.

55.     These restrictions are essential to Ceva's ability to exercise its quality controls over Ceva products because they prevent unauthorized sellers from obtaining and reselling Ceva products and allow Ceva to know where all of its products are being sold online by Authorized Sellers.  If a quality issue arises through an online sale, Ceva can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately.  Ceva is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

56.     In addition to restricting where and how Authorized Sellers can sell Ceva products, the Ceva Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Ceva products.

57.     To ensure that customers receive the genuine and high-quality products they expect from Ceva, the Ceva Rules require Authorized Sellers to inspect all Ceva products for any damage, defects, broken seals, evidence of tampering, and other non-conformance and remove all such products from their inventory.   Authorized Sellers are prohibited from selling damaged or

defective products and are required to report any discovered defects to Ceva to assist it with identifying any product quality issues.

58.     Authorized Sellers must also regularly inspect their inventory for any products that are expired ("Not-Current Products"), not sell any Not-Current Products to consumers, and destroy or dispose of Not-Current Products in accordance with instructions provided by Ceva.

59.     The Ceva Rules also require that Authorized Sellers store Ceva products in accordance with their labeled requirements and other further guidelines issued by Ceva.  These requirements help ensure that Ceva products are stored properly and are not damaged prior to being shipped to the consumer.

60.     To avoid consumer confusion and ensure that customers receive genuine Ceva products, Authorized Sellers must sell Ceva products in their original packaging and are prohibited from relabeling, repackaging, diluting, or altering Ceva products or any accompanying label, literature, or safety-related information without Ceva's consent.  Authorized Sellers are prohibited from reselling any products that have been returned opened or repackaged.

61.     Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Ceva products, including any serial number, UPC code, or other identifying information.

62.     The Ceva Rules give Ceva the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Ceva products, to ensure their compliance with Ceva's quality control requirements.  During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of their sources of all Ceva products.  If Ceva discovers that an Authorized Seller is failing to follow the Ceva Rules,

Ceva has the right to cease selling its products to the Authorized Seller and to suspend or terminate its status as an Authorized Seller of Ceva products.

63.     Authorized Sellers must also communicate all safety information to consumers and cooperate with Ceva with respect to any product recall or other consumer safety information dissemination effort conducted by Ceva regarding Ceva products.

64.     The Ceva Rules also require Authorized Sellers to provide various customer services to their customers.  For example, Authorized Sellers must familiarize themselves with the features of all Ceva products kept in their inventory so they can advise customers on the selection and safe use of Ceva products.   Authorized Sellers must also report to Ceva any customer complaint regarding a Ceva product, assist Ceva in investigating any such complaint, and help customers themselves contact Ceva's customer service if needed.

65.     Ceva's quality control and customer service requirements are legitimate and substantial and have been implemented so that Ceva can control the quality of goods manufactured and sold under the Ceva Trademarks, to protect consumers as well as the value and goodwill associated with the Ceva Trademarks.

66.     Ceva's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor-quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Ceva product they were considering buying was being sold by an Authorized Seller who is subject to Ceva's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Ceva's quality controls and over whom Ceva is unable to exercise its quality controls.

**Given the Flood of Poor-Quality Products Sold Online and Consumers'
Inability to Inspect Such Products Before Purchase, Ceva Imposes
Additional Requirements on Its Authorized Sellers Who Sell Online**

67.     As shown in the consumer reviews cited above (*see* ¶¶ 38-42, *supra*), Ceva products sold online are more susceptible to quality and authenticity problems because consumers cannot see products before buying them.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.  Given these heightened risks to consumer satisfaction and the value of its Ceva Trademarks that are posed by online sellers, Ceva imposes additional quality control requirements on all of its Authorized Sellers that sell Ceva products online.

68.     The Ceva Rules allow Authorized Sellers to sell Ceva products to end-user consumers online only through "Permissible Public Websites," "Veterinary Home Delivery Platforms," and "Authorized Websites."  These rules allow Ceva to oversee all Authorized Sellers who sell Ceva products online.

69.     A "Permissible Public Website" is a website that: (1) is operated by a Ceva Authorized Reseller in the Authorized Reseller's own legal name or registered fictitious name, (2) is not a third-party storefront on an online marketplace website; and (3) lists the Authorized Reseller's mailing address, telephone number, and email address.  A "Veterinary Home Delivery Platform" is a website or mobile application that: (1) is operated by a Ceva Authorized Distributor; (2) is used to facilitate orders of Ceva products from end-user consumers who are direct customers of a Ceva Authorized Seller that operates a veterinary clinic; and (3) requires customers to create an account with the Authorized Seller veterinary clinic to be able to purchase Ceva products.

70.     Authorized Sellers must receive prior written approval from Ceva before they can sell Ceva products on any website that does not meet the criteria of a Permissible Public Website

19

or Veterinary Home Delivery Platform.  To obtain this approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Ceva products, and list the specific websites where they wish to sell products.  Applicants then undergo vetting by Ceva that includes review of their business operating business record and online review history.  A website that Ceva permits an Authorized Seller to use through this process is called an "Authorized Website."

71.     Online marketplaces, including Amazon, do not qualify as "Permissible Websites" or "Veterinary Home Delivery Platforms" because they are operated by third parties rather than an Authorized Seller.  Accordingly, Authorized Sellers are prohibited from selling on any online marketplace, including Amazon, unless they are vetted by Ceva and specifically approved to sell on an online marketplace.

72.     The Ceva Rules impose numerous additional requirements on Authorized Sellers who sell Ceva products on Permissible Public Websites, Veterinary Home Delivery Platforms, or Authorized Websites (collectively, "Authorized Online Sellers").

73.     For example, Authorized Online Sellers must use images of Ceva products that are provided or approved by Ceva and keep product descriptions up to date.  Authorized Online Sellers are also prohibited from advertising any Ceva product they do not carry in their inventory.

74.     The Ceva Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Ceva or another third party.  These requirements allow consumers of Ceva products to understand the nature of the seller from whom they are purchasing and enable consumers to contact the seller if any quality issues arise.  These requirements also allow Ceva to protect the public from the sale of poor-quality

or counterfeit Ceva products because it allows for easy detection of an Authorized Online Seller that sells poor-quality or counterfeit goods.

75.     Authorized Online Sellers who sell Ceva products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Ceva.  At Ceva's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Public Website or Authorized Website where Authorized Online Sellers are selling Ceva products.

76.     Unless otherwise approved by Ceva, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Ceva products.  Authorized Online Sellers are also prohibited from using any fulfillment service that could cause customers to receive Ceva products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet Ceva's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Ceva's quality controls.

77.     All websites where Authorized Online Sellers sell Ceva products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to Ceva upon request; and (iii) cooperate with Ceva in investigating negative online reviews related to sales of Ceva products.

78.     The additional quality control requirements that Ceva exercises over online sales of its products are legitimate and substantial and have been implemented to allow Ceva to carefully

control the quality of Ceva products that are sold online and quickly address any quality issues that arise.

79.      Ceva's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Ceva products online receive genuine, high-quality Ceva products that abide by Ceva's quality controls.  Consumers purchasing Ceva products online would find it relevant to their purchasing decision to know whether a product they are buying is vended by Ceva or by one of its Authorized Online Sellers that is subject to, and abides by, Ceva's quality controls.

### Ceva Monitors and Audits Its Authorized Online Sellers To Ensure They Comply With Its Quality Control Requirements

80.      Ceva regularly audits its Authorized Online Sellers to ensure they are adhering to its quality control requirements.  Ceva carries out its auditing and monitoring actions pursuant to an internal program called the Ceva Online Quality Control Auditing Program ("Auditing Program").

81.      As part of its Auditing Program, Ceva examines a rotating sample of Permissible Public Websites on a regular basis to ensure that the Authorized Online Sellers who sell through the websites are complying with the Ceva Rules.  During these examinations, Ceva checks to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Ceva or a third party; (iii) do not display any content that could be detrimental to the Ceva and its brands; (iv) do not make any representations regarding Ceva products that are misleading; (v) exclusively contain images of Ceva products and product descriptions that are supplied or authorized by Ceva and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

82.     Ceva also periodically inspects online reviews of Ceva products and Authorized Online Sellers that appear on Permissible Public Websites.  If Ceva discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor-quality Ceva products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Ceva communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

83.     Ceva also periodically conducts a test purchase of a Ceva product from a rotating sample of Permissible Public Websites.  If Ceva discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Permissible Public Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Ceva communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

84.     If Ceva discovers that an Authorized Online Seller is selling Ceva products of poor quality or otherwise not adhering to Ceva's quality control or customer service requirements, Ceva may conduct an investigation to determine the source of the problem.  The Ceva Rules require that Authorized Online Sellers cooperate with Ceva's investigation, permit Ceva to inspect their facilities and records relating to Ceva products, and disclose all information about where they obtained Ceva products.  Based on what its investigation reveals, Ceva has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Ceva products.

**Defendants Are Not Authorized Sellers and Are Illegally Selling
Non-Genuine Products Bearing the Ceva Trademarks**

85.     Because the unauthorized sale of Ceva products over the Internet threatens the reputation and goodwill associated with the Ceva Trademarks, Ceva actively monitors the sale of its products online.

86.     In the course of this monitoring, Ceva discovered that high volumes of products bearing the Ceva Trademarks were being illegally sold on Amazon through a storefront called "Shop With Saving."

87.     Ceva sent a cease-and-desist letter to the entity affiliated with the "Shop With Saving" storefront on August 9, 2023.  That entity was called Dollar Bills With Cents LLC and was connected to an individual named Temeka Ford ("Ford").

88.     At some point after the first cease-and-desist letter, the "Shop With Saving" storefront changed its affiliated entity to Shoppin Savin LLC.  After a reasonable search of publicly available and subscription-based databases, Ceva asserts, on information and belief, that Shoppin Savin LLC is not a real, legal entity.

89.     Ceva then sent another cease-and-desist letter to Dollar Bills With Cents LLC on October 17, 2023.

90.     Shortly after that letter was sent, Ford reached out to Ceva's counsel.  Ford stated that she no longer operated the "Shop With Saving" storefront.  Attached as **exhibit 1** of this Complaint is a Declaration of Temeka Ford (Ford Decl.).

91.     Ford explained that although she had originally created the "Shop With Saving" storefront in 2017, she had sold it to Premium in April of 2023.  Ford Decl. at ¶¶ 3-4.  Ford's contact at Premium was John Doe 1, Lynn, who identified as the owner and operator of Premium. *Id.* at ¶ 4.  She has not had any connection with Premium or Lynn since the sale.  *Id.*  Thus, Ford

has had no connection to the "Shop With Saving" storefront's infringing sales of Ceva products at all times relevant to this Complaint.

92.    However, Ford suspected that Premium was still using her residential address of 10232 Wood Fern Court, Conroe, TX 77385 as a return address for products sold on the "Shop With Saving" storefront because she received several packages of returned products.  *Id.* at ¶¶ 2, 6-7.  This was confirmed by a test purchase that Ceva conducted in July of 2023, after Ford had sold the "Shop With Saving" storefront.  The return address on the package listed the prior affiliated entity, Dollar Bills With Cents LLC, and Ford's residential address.

93.    Filings with the Florida Secretary of State list Premium's address as 1317 Edgewater Drive Ste. #6045 Orlando, FL 32804.  This address is a virtual office at a "Physicaladdress.com" location.  The filing is signed by Viktoriia Dorosh as a member or authorized representative of Premium.  A search of public records reveals no record for a Viktoriia Dorosh and upon information and belief, this does not appear to be a real person.

94.    Additionally, the "Shop With Saving" storefront continues to list the fictitious entity, Shoppin Savin LLC, and lists a residential address that apparently has not connection to Premium or Lynn:

## Shop With Saving

Visit the Shop With Saving storefront

★★★★½ | **84% positive** in the last 12 months (70 ratings)

## Detailed Seller Information

**Business Name:** SHOPPIN SAVIN LLC
**Business Address:**
   5310 Steven Rd
   Ste F3
   Boynton Beach
   FL
   33472
   US

95.    In further monitoring efforts, Ceva discovered another storefront on Amazon illegally selling a high volume of products bearing the Ceva Trademarks called "J3-Deals."

96.    Ceva began sending cease-and-desist letters to the entity affiliated with the "J3-Deals" storefront in March of 2023.  That entity affiliated with the "J3-Deals" storefront was called J3 Deals LLC and was connected to an individual named Jerry Ellis ("Ellis").

97.    At some point after the first cease-and-desist letter, the "J3-Deals" storefront changed its affiliated entity to Three Deals LLC.  After a reasonable search of publicly available and subscription-based databases, Ceva asserts, on information and belief, that Three Deals LLC is not a real, legal entity.

98.    On March 11, 2024, Ceva sent another cease-and-desist letter to J3 Deals LLC to an updated address.

99.    Shortly after that letter was sent, Ellis reached out to Ceva's counsel.  Ellis stated that he no longer operated the "J3-Deals" storefront.  Attached as **exhibit 2** of this Complaint is a Declaration of Jerry Ellis (Ellis Decl.).

100.    Ellis explained that although he had originally created the "J3-Deals" storefront, he sold it to Premium in January of 2023.  Ellis Decl. at ¶¶ 3-4.  Ellis's contact at Premium was John Doe 1, Lynn, who is identified as the owner and operator of Premium.  *Id.* at ¶ 4.  Ellis has not had any connection with Premium or Lynn since the sale.  *Id.*  Thus, Ellis has had no connection to the "J3-Deals" storefront's infringing sales of Ceva products at all times relevant to this Complaint.

101.    Lynn sent Ellis various instructions to transfer the ownership of the "J3-Deals" storefront account, including specific credit card and bank account information.  *Id.* at ¶ 5, Ex. A.

102.    The instructions that Lynn provided were to link the account to a Georgia address. *Id.*  However, "J3-Deals" storefront continues to list the fictitious entity, Three Deals LLC, and lists a Tennessee address that formerly belonged to Ellis:

## J3-Deals

Visit the J3-Deals storefront

★★★★⯪ | **91% positive** in the last 12 months (77 ratings)

**Detailed Seller Information**

**Business Name:** THREE DEALS LLC
**Business Address:**
  9292 Kingston Pike
  Knoxville
  TN
  37922
  US

103.    Defendants in this case have a *modus operandi*.  Ceva has now discovered two identical instances where they have bought Amazon Storefronts, used those storefronts to infringe the Ceva Trademarks, and used fraudulent business addresses and business names to avoid detection.

104.    Premium continues to search for more storefronts to buy.  Counsel for Ceva has discovered a variety of advertising by Premium, including paid advertising and on social media, inviting storefront owners to sell their storefronts to Premium.  Additionally, Premium continues to operate its website, allowing storefront owners to easily sell their storefronts, unaware that Premium will misappropriate the seller's identity.  Premium's website can be found here: https://www.premiumsellers.com/.

105.    Defendants have tried to obfuscate their activities every step of the way.  It is only through intensive investigation as well as Ford's and Ellis's cooperation that Ceva has been able to identify Premium as the operators of the Amazon Storefronts—cooperation that Defendants

themselves tried to obstruct.  In October 2023, Ford reached out to Premium asking what she should do about a cease-and-desist letter she received from Ceva.  She was told that she "should throw the letter away as it is spam that they receive every day."  Ford Decl. at ¶ 9.

106.    Upon information and belief, Ceva asserts that the Ceva products sold by Defendants were improperly acquired and the various storefronts are being used to legitimize sales of these products while hiding their true identities.  Currently, Ceva does not know how many more storefronts owned and operated by Premium are being used to infringe the Ceva Trademarks. This is the intended result of Defendants' complex scheme to misuse the identities of others and hide from brands like Ceva, as well as potential law enforcement investigators.

107.    Defendants are not Authorized Sellers of Ceva products and are not subject to, and do not comply with, the Ceva Rules or the quality controls that Ceva imposes on its Authorized Sellers.

108.    Despite being on notice that their activities infringe on Ceva's trademarks, Defendants have made patently clear that they do not intend to stop.

109.    Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Ceva Trademarks through their Amazon Storefronts.  Monitoring software estimates that Defendants have sold more than 29,000 infringing products through their Amazon Storefronts for revenue in excess of $2M.

110.    Upon information and belief, through their Amazon Storefronts on the highly interactive Amazon website, Defendants accept and fulfill orders from Kansas residents for products bearing the Ceva Trademarks and cause substantial quantities of infringing products bearing the Ceva Trademarks to be shipped to persons located in Kansas through the regular course of business.

111.    As of the time of filing, Defendants' Amazon Storefronts are called "Shop With Saving" and "J3-Deals."   Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID number for the "Shop With Saving" storefront is A1FCNWLH3INPJ7 and the Merchant ID number for the "J3-Deals" storefront is A3Q37QN05NSF47.

**Defendants Are Infringing the Ceva Trademarks by Selling Products Bearing the Ceva Trademarks That Are Not Subject To, Do Not Abide By, and Interfere With Ceva's Quality Control and Customer Service Requirements**

112.    Defendants, without authorization from Ceva, have sold—and continue to sell—products bearing the Ceva Trademarks through their Amazon Storefronts.  Defendants may also be selling products through additional channels that Ceva has not yet discovered and cannot discover until it is able to take discovery.

113.    Ceva has implemented quality control and customer service requirements throughout its authorized channels of distribution.  The products sold by Defendants are not genuine Ceva products because they are not subject to, do not abide by, and interfere with Ceva's quality control and customer service requirements that Authorized Sellers must follow.

114.    Ceva's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to, do not abide by, and interfere with these requirements, Ceva has lost control of the quality of goods that bear its Ceva Trademarks.

115.    Defendants do not abide by Ceva's quality control requirements because they sell products on Amazon.  Ceva does not allow any of its Authorized Sellers to sell Ceva products on

Amazon unless they obtain Ceva's approval because of the goodwill and consumer safety issues associated with uncontrolled sales on online marketplaces discussed above. *See* ¶¶ 38-42, *supra*.

116.    Defendants also do not abide by Ceva's quality control requirements—and interfere with Ceva's quality controls—because they have not provided Ceva with their business information nor given Ceva an opportunity to vet them to determine if they meet Ceva's high standards for what it demands of its Authorized Sellers that it approves to sell Ceva products online through Authorized Websites.   Instead, Defendants sell products online without Ceva's authorization or oversight.

117.    Defendants also do not comply with Ceva's quality control requirements—and interfere with Ceva's quality controls—because they have not disclosed to Ceva where they sell Ceva products online.  Defendants also do not provide customer feedback to Ceva that relates to their sales of products bearing the Ceva Trademarks or cooperate with Ceva in investigating negative online reviews relating to their sales of products bearing the Ceva Trademarks, as Authorized Online Sellers are required to do.  These actions prevent Ceva from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Ceva Trademarks.

118.    Defendants do not comply with Ceva's quality control requirements—and interfere with Ceva's quality controls—because they: (1) have not disclosed to Ceva where they acquire products that bear the Ceva Trademarks; and (2) have not given Ceva the right to audit and inspect their facilities and records.  As a result, among other things, Ceva cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor-quality products; (iii) selling products only in official and unaltered Ceva packaging; (iv) improperly allowing products that have been returned or repackaged to be listed

as "new" products; (v) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vi) providing exceptional customer service and responding appropriately to feedback received from customers.  Ceva also cannot obtain Defendants' assistance with any recall or consumer safety information efforts that may arise related to any products they are selling or have sold in the past.

119.    Consumers on Amazon can leave reviews of sellers as well as products.  Reviews of Defendants' "Shop With Saving" Amazon storefront show that Defendants have sold numerous poor-quality products to consumers.

120.    For example, customers have complained about receiving products that were in incorrect or damaged packaging and having difficulty getting customer service from the "Shop With Saving" storefront:

★☆☆☆☆  "Extremely poor packaging/shipping. Pictured as 1 box of six refills in sturdy cardboard box. Received 3 cardstock "boxes" of 2 each that were completely smashed, crushed and torn because they were shoved in a poly envelope with no protection."
Read less
By Amazon Customer on March 2, 2024.

★☆☆☆☆  "Need a refund. Item never came"
By Kyle S. on June 25, 2023.

★★☆☆☆  "This item was listed as a box of six, not six individual boxes. The product Feliway is great but the shipping/packing method was much less than preferred. The 6 individual boxes were stuffed in a plastic envelope and were crushed making stacking on the shelf impossible."
Read less
By NK on June 28, 2023.

★★☆☆☆  "Try contacting seller...many times .. I got a Junk that has been refurbished or something.. there no place to send them a message!! I got a robot. No help"
By Carolyn Everitt on November 10, 2023.

121.    These reviews are only a sample of the negative reviews that customers have written about Defendants and the "Shop With Saving" storefront.  The "J3-Deals Storefront" contains similar reviews from dissatisfied customers.

31

122.    Ceva allows its products to be sold only by itself and by Authorized Sellers who are subject to its quality controls to prevent customers from suffering experiences like those described in the above complaints about Defendants.

123.    These reviews, along with the numerous negative customer reviews of Ceva products that Defendants have sold, *see supra* ¶¶ 38-42, show that Defendants are not carrying out the quality control inspection, storage, or handling requirements that Ceva requires Authorized Sellers to follow for Ceva products.  Instead, Defendants are likely selling products bearing the Ceva Trademarks to consumers that are tampered with, not sealed, previously used, damaged, defective, and old.  These sales cause customers to write highly negative reviews of Ceva products that harm Ceva's reputation and hurt the placement of Ceva products in search results.

124.    Defendants' failure to abide by the Ceva Rules prevents Ceva from exercising control over the quality of products Defendants sell bearing the Ceva Trademarks.  Unlike with its Authorized Online Sellers, Ceva cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

125.    Through their unauthorized use of the Ceva Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Ceva products.  In reality, however, the products sold by Defendants are materially different from genuine Ceva products—and are not genuine products—because they are not subject to, do not abide by, and interfere with Ceva's quality control and customer service requirements that Authorized Sellers must follow.

**Defendants Are Infringing the Ceva Trademarks by Selling Products Bearing the Ceva Trademarks That Do Not Come With the Ceva Satisfaction Guarantee**

126.    Genuine Ceva products purchased from Ceva or Ceva's Authorized Sellers come with the Ceva 60-Day Satisfaction Guarantee.  However, Ceva does not provide the Satisfaction Guarantee for products purchased from any other seller because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

127.    Because Defendants are not Authorized Sellers and are thus not subject to Ceva's quality control requirements, the products bearing the Ceva Trademarks that Defendants sell do not come with the Ceva Satisfaction Guarantee.

128.    Because the products Defendants sell do not come with the Ceva Satisfaction Guarantee, they are materially different from genuine Ceva products.

129.    The Ceva Satisfaction Guarantee is a material component of genuine Ceva products.  Consumers considering whether to purchase Ceva products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Ceva Satisfaction Guarantee.  Consumers who purchase Ceva products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Ceva stands behind the product, and that they can get a refund or product replacement if they are not satisfied.

130.    Defendants' unauthorized sale of non-genuine products bearing the Ceva Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Ceva products that come with the Ceva Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With
Ceva's Agreements With Its Authorized Sellers**

131.    As discussed, Ceva allows Ceva's products to be sold to end-user consumers only by itself and by Authorized Sellers.

132.    Ceva has entered into agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Ceva products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

133.    Defendants have sold and are continuing to sell a high volume of products bearing the Ceva Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers. Thus, upon information and belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

134.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Ceva.

135.    Defendants have known that Ceva's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

136.    Defendants have known of this prohibition since at least March 18, 2024.  On that date, Ceva overnight mailed and emailed a cease-and-desist letter to Defendants explaining that Ceva has agreements with all of its Authorized Sellers that prohibit them from selling Ceva products to any person or entity that, like Defendants, is not an Authorized Seller but intends to resell the products.

137.    Despite Defendants best attempts to avoid detection, there can be no doubt that they have actual knowledge of the numerous cease-and-desist letters that Ceva has sent in its investigation.  This is evidenced by Lynn's own statement and instructions to Ford to throw away letters she received.  *See* Ford Decl. at ¶ 9.

138.    Ceva's letter also informed Defendants that, by purchasing Ceva products from an Authorized Seller for the purpose of reselling them, they are causing a breach of the agreement between Ceva and its Authorized Seller and are interfering with Ceva's agreements and business relationships.

139.    Ceva's March 18, 2024 letter also advised Defendants that if they continued to acquire products from Ceva's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with Ceva's contracts and business relationships with its Authorized Sellers.

140.    Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Ceva's agreements with its Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

141.    In interfering with Ceva's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Ceva products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Ceva—so that Defendants could unlawfully infringe upon and materially damage the value of the Ceva Trademarks by reselling the products on the Internet, thereby committing an independent tort.

142.    Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**The Individual Defendants Are Liable**

143.    Ceva asserts claims against John Doe 1 (the individual using the name "Serge Lynn") in his individual capacity as well as his capacity as a corporate officer of Premium.

144.    Upon information and belief, Lynn authorizes, directs, or otherwise personally participates in the sale of infringing products bearing the Ceva Trademarks by Premium.  These are affirmative actions beyond merely holding an ownership interest in Premium.  Accordingly, Lynn is personally liable for the infringing activities of the Amazon Storefronts without regard to piercing the corporate veil.

145.    Additionally, Lynn's conduct in this case is the type for which Kansas courts will generally disregard the corporate entity because the entity in this case is being "used as a cloak or cover for fraud or illegality, or to work an injustice." *Kilpatrick Bros., Inc. v. Poynter*, 473 P.2d 33, 41 (Kan. 1970).  Disregarding the entity in this case is necessary to achieve equity.

146.    Alternatively, upon information and belief, the factors that Kansas courts analyze favor piercing the corporate veil.  These include Premium's failure to observe corporate formalities, the nonfunctioning of other officers or directors, the absence of corporate records, Lynn's use of the entity as a façade for his operations, and Lynn's use of the corporate entity in promoting injustice or fraud.  Premium is merely an alter ego for Lynn and Ceva is entitled to pierce the corporate veil and hold Lynn personally liable for the infringing activities of the Amazon Storefronts.

**Ceva Has Suffered Substantial Harm as a Result of Defendants' Conduct**

147.    As set forth above, the unauthorized sale of products bearing the Ceva Trademarks by unauthorized sellers such as Defendants has caused significant harm to the Ceva brand.

148.     When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Ceva.  As such, Defendants' ongoing sale of non-genuine products bearing the Ceva Trademarks harms Ceva and its brands.

149.     Ceva has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

150.     Ceva has also suffered, and will continue to suffer, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

151.     Ceva is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Ceva Trademarks, causing continued irreparable harm to Ceva's reputation, goodwill, relationships, intellectual property, and brand integrity.

152.     Additionally, Ceva is entitled to injunctive relief requiring Defendants to return or destroy infringing products because without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

153.     Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

154.     Defendants' willful infringement of the Ceva Trademarks and continued pattern of misconduct demonstrate intent to harm Ceva.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

155.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

156.     Ceva has secured the rights to each of the Ceva Trademarks.

157.     The Ceva Trademarks are registered with the United States Patent and Trademark Office.

158.     The Ceva Trademarks are valid and subsisting trademarks in full force and effect.

159.     Defendants willfully and knowingly used, and continue to use, the Ceva Trademarks in interstate commerce for the purpose of selling non-genuine products bearing the Ceva Trademarks without Ceva's consent.

160.     The products bearing the Ceva Trademarks that Defendants sell are not authorized for sale by Ceva.

161.     Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Ceva Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Ceva when they are not.

162.     Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Ceva products.

163.     The products sold by Defendants are not, in fact, genuine Ceva products.  The products sold by Defendants are materially different from genuine Ceva products because, among

other reasons, they are ineligible for the Ceva Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Ceva's quality control requirements.

164.     Defendants' unauthorized use of the Ceva Trademarks has infringed upon and materially damaged the value of the Ceva Trademarks and caused significant damage to Ceva's business relationships.

165.     As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, immediate and irreparable harm.  Ceva has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

166.     Ceva is entitled to recover its damages caused by Defendants' infringement of the Ceva Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

167.     Furthermore, Ceva is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, Ceva will suffer irreparable harm.

168.     Ceva is also entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Ceva Trademarks.

**SECOND CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

169.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

170.     As set forth above, Defendants are selling non-genuine products bearing the Ceva Trademarks that are materially different from genuine Ceva products.

171.     Defendants' sale of non-genuine products bearing the Ceva Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Ceva when they are not.

172.     Defendants' sale of non-genuine products bearing the Ceva Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Ceva products when they are not.

173.     Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

174.     Furthermore, Ceva is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Ceva will suffer irreparable harm.

175.     Ceva is also entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

### THIRD CAUSE OF ACTION
### Common Law Trademark Infringement

176.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

177.     Ceva has secured the rights to each of the Ceva Trademarks.

178.     The Ceva Trademarks are registered with the United States Patent and Trademark Office.

179.     The Ceva Trademarks are valid and subsisting trademarks in full force and effect.

180.    The Ceva Trademarks are distinctive and widely recognized by the consuming public. Ceva's products are sold and purchased by Ceva's network of Authorized Sellers throughout the United States, including in Kansas.

181.    Defendants willfully and knowingly used, and continue to use, the Ceva Trademarks in commerce for purposes of selling non-genuine products bearing the Ceva Trademarks in Kansas without Ceva's consent.

182.    Defendants' use of the Ceva Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Ceva Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Ceva when they are not.

183.    Defendants' use of the Ceva Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Ceva products.

184.    The products sold by Defendants are not, in fact, genuine Ceva products. The products sold by Defendants are materially different from genuine Ceva products because, among other reasons, they are ineligible for the Ceva Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Ceva's quality control requirements.

185.    Defendants' unauthorized use of the Ceva Trademarks has infringed upon and materially damaged the value of the Ceva Trademarks and caused significant damage to Ceva's business relationships.

186.     As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, immediate and irreparable harm.  Ceva has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

187.     Ceva is entitled to recover its damages caused by Defendants' infringement of the Ceva Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

188.     Ceva is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

**FOURTH CAUSE OF ACTION**
**Common Law Unfair Competition**

189.     Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

190.     As set forth above, Defendants are selling non-genuine products bearing the Ceva Trademarks that are materially different from genuine Ceva products.

191.     Defendants' sales of non-genuine products bearing the Ceva Trademarks are likely to cause consumer confusion and lead consumers to believe that the products are affiliated with, connected with, associated with, sponsored by, or approved by Ceva when they are not.

192.     Defendants' sales of non-genuine products bearing the Ceva Trademarks are likely to cause consumer confusion and lead consumers to believe that the products are genuine Ceva products when they are not.

193.     Defendants' unauthorized sales of products bearing the Ceva Trademarks and unauthorized use of the Ceva Trademarks in advertising infringe the Ceva Trademarks and constitute unfair competition at common law.

194.    As a proximate result of Defendants' actions, Ceva has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

195.    Ceva is entitled to recover its damages caused by Defendants' unfair competition and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

196.    Ceva is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## FIFTH CAUSE OF ACTION
### Tortious Interference with Existing Contracts and Business Relationships

197.    Ceva hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

198.    Other than products that Ceva itself directly sells to consumers, Ceva products are sold to the public exclusively through Ceva's network of Authorized Sellers.

199.    Ceva has entered into valid and enforceable agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Ceva products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

200.    Defendants are not Authorized Sellers and have sold—and are continuing to sell— a high volume of products bearing the Ceva Trademarks on the Internet.  Ceva has also not itself sold any Ceva products to Defendants.

201.    Based on these facts, it is reasonable to infer that Defendants acquired the products they are selling at least in part from one or more of Ceva's Authorized Sellers.

202.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Ceva.

203.    Defendants have known that Ceva's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

204.    Defendants have known of this prohibition, among other reasons, because Ceva informed Defendants of this prohibition in a cease-and-desist letter it overnight mailed to Defendants on March 18, 2024.

205.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Ceva's agreements with its Authorized Sellers by continuing to induce Authorized Sellers to breach their agreements and sell products to Defendants so that Defendants could unlawfully resell them.

206.    In interfering with Ceva's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Ceva products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Ceva—so that Defendants could unlawfully infringe upon and materially damage the value of the Ceva Trademarks by reselling the products on the Internet, thereby committing an independent tort.

207.    Ceva's agreements with its Authorized Sellers are a specific class of contract that Defendants are causing Authorized Sellers to breach when they purchase products from Authorized Sellers for resale.  Although Ceva does not yet know which specific Authorized Seller(s) have breached their agreements with Ceva—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know

44

from whom they obtained the products they have resold and are on notice of the basis for Ceva's claim of tortious interference.

208.    Defendants are not parties to the contracts they caused Authorized Sellers to breach.

209.    Defendants' actions have caused injury to Ceva for which Ceva is entitled to compensatory damages in an amount to be proven at trial.

210.    The injury to Ceva is immediate and irreparable, as Ceva's reputation and relationships have been damaged among its consumers and Authorized Sellers.

211.    Ceva is also entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Ceva's rights.

## PRAYER FOR RELIEF

WHEREFORE, Ceva prays for relief and judgment as follows:

A.    Judgment in favor of Ceva and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, punitive damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.    An accounting of Defendants' profits from their sales of infringing products bearing the Ceva Trademarks;

C.    That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Ceva Trademarks;

ii)   Prohibiting the Enjoined Parties from using any of the Ceva Trademarks in any manner, including advertising on the Internet;

iii)  Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Ceva Trademarks;

iv)   Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Ceva Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing the Ceva Trademarks;

v)    Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any Ceva products, or any of the Ceva Trademarks;

vi)   Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Ceva Trademarks which associate Ceva's products or the Ceva Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)    Requiring the Enjoined Parties to take all action to remove the Ceva Trademarks from the Internet, including from the website www.amazon.com;

viii)    Requiring the Enjoined Parties to take all action to remove, or cause to be removed, any customer reviews of products bearing Ceva's Trademarks that were sold by Defendants on third-party marketplace websites including, but not limited to, www.amazon.com and the storefronts with Merchant IDs: A1FCNWLH3INPJ7 and A3Q37QN05NSF47; and

ix)    Requiring the Enjoined Parties to destroy or return to Ceva all products bearing the Ceva Trademarks in their possession, custody, or control.

D.    An order requiring Amazon.com, Inc. to freeze all funds in any accounts owned or controlled by Defendants;

E.    An award of attorneys' fees, costs, and expenses; and

F.    Such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ceva demands a trial by jury on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Local Rule 40.2(a), Ceva designates Kansas City, Kansas as the place of trial for this matter.

Dated:  April 26, 2024                    Respectfully submitted,

                                          */s/ Sean W. Colligan*
                                          Sean W. Colligan, Kan. Bar # 25727
                                          STINSON LLP
                                          1201 Walnut Street, Suite 2900
                                          Kansas City, MO 64106-2150
                                          Tel: (816) 691-3384
                                          sean.colligan@stinson.com

                                          ***Attorneys for Plaintiff Ceva Animal Health, LLC***

Of Counsel:

Martha Brewer Motley (OH Bar No. 0083788)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH  43215
Telephone: (614) 464-6360
Email:  mbmotley@vorys.com

Stephan P. Laboy (OH Bar No. 0103584)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-6403
Email:  splaboy@vorys.com

*Pro Hac Vice applications forthcoming*